THE CITY OF ROCHESTER, Plaintiff, *v.* WILFORD LINDNER, Defendant.

City Court of Rochester, Criminal Branch, March 25, 1938.

*Thomas P. Culhane, Assistant District Attorney,* for the plaintiff.

*Donald J. Corbett, Assistant Attorney-General,* for the defendant.

WILDER, J. Is the defendant, a game protector of the Department of Conservation of the State, subject to the restrictions of a speed ordinance of the city of Rochester while he is driving his automobile to investigate a complaint that someone is engaged in illegal trapping? This question was raised by the defendant who, I find from the evidence, was exceeding the rate of speed prescribed by the ordinance.

The question is not complicated by any claim of reckless or other disregard of the safety of others. The speed, the location and absence of traffic negative any thought that the car was an actual menace to any specific person or persons. On that score are to be considered only the potentialities for harm in driving some fifty miles per hour in an area where speed is by ordinance limited to thirty.

The burden of the defendant's contention is that he is a peace officer and that, therefore, his automobile, while driven by him in the course of his duties, is a " police vehicle " within the meaning of subdivision 8 of section 2 of the Vehicle and Traffic Law, which, taken together with section 10 thereof, excepts certain vehicles from the application of traffic laws and regulations.

To sustain his claim that he is a peace officer, he cites section 169 of the Conservation Law, which, after enumerating in detail the duties and powers of game protectors, provides that they may " exercise such other powers of peace officers in the enforcement of the provisions of this chapter * * * as are not herein specifically provided." Taking a practical viewpoint, let it be assumed that this section does make the defendant a peace officer. Still it does not confer the right to violate regulatory measures unrelated to conservation.

That right, the defendant urges, is conferred by the Vehicle and Traffic Law (§ 2, subd. 8; § 10) which excepts from the operation of that law "fire, police vehicles, ambulances" and other things such as tractors, road rollers, power shovels, etc. This exception, by itself, is confined in its application to the Vehicle and Traffic Law. Does it also apply to local speed ordinances? Section 54 of the Vehicle and Traffic Law forbids local authorities to pass or enforce any ordinance restricting "motor vehicles" or their speed, with a proviso that nothing in the chapter contained shall impair the validity or effect of any ordinances regulating the speed of "motor vehicles" in cities of the first class (Rochester being such).

In short, then, the Vehicle and Traffic Law provides: a "police vehicle" is not a "motor vehicle" (§ 2, subd. 8); local authorities may not regulate the speed of "motor vehicles," provided that the power of cities of the first class to regulate the speed of "motor vehicles" remains unimpaired (§ 54). It seems clear that the proviso neutralizes the restriction in its application to cities of the first class.

The next consideration must be given to the effect of the provision of section 54 that no ordinance " in anywise inconsistent with the provisions of this chapter * * * shall have any effect." Both the statute (§ 2, subd. 8) and the ordinance of the city of Rochester (§ 92) provide that "motor vehicle" includes "all vehicles propelled by power, other than muscular power." The statute as already stated specifies numerous exceptions including "fire and police vehicles and ambulances." The ordinance makes no exceptions. Here is an inconsistency to be sure, but it relates merely to a matter of definition and not to any express provision respecting speed. Indeed, the statute comes no nearer to restricting speed than to provide in section 56 what speed shall be presumptive evidence of driving at a speed which is not careful and prudent.

The ordinance was enacted by virtue of power given in section 116 of the Charter of the City of Rochester " to enact ordinances, not inconsistent with law," for the safety and welfare of its inhabitants." As seen, section 54 of the Vehicle and Traffic Law preserves that power so far as not inconsistent with that law, and so far as it relates to the speed of motor vehicles. It does not seem that this recognized supremacy of the city in the field was intended to be limited by a mere definition of the term "motor vehicle." Had the Legislature prescribed speeds other than those set forth in the ordinance, then the statute would take precedence so far as there was inconsistency. But it has not done so, and it

must be presumed that this omission was intentional and not due to oversight. Therefore, no good reason appears for supposing that, in merely defining a "motor vehicle," it was the purpose to deny to the city the right to restrict the operation of fire and police vehicles and ambulances, or traction engines or road rollers or tractors or cranes or power shovels or snow plows or snow sweepers or sand spreaders (all of which are excepted by subdivision 8 of section 2 of the Vehicle and Traffic Law). It cannot be that the rights of operators of such devices are paramount to the powers of the council, and that they must remain uncontrolled and unrestricted until the Legislature acts.

But that would be the result of such an interpretation of the law. And it would be inconsistent with the general purpose to grant autonomy to cities in such matters. Nor would it square with the power conferred upon the State Traffic Commission to restrict speed outside cities and villages. Section 95-c of the Vehicle and Traffic Law provides that the Commission may restrict the speed of " vehicles," and " vehicle " is defined in subdivision 7 of section 2 so as to include every device excluded by subdivision 8 in defining " motor vehicle." Thus the Commission may restrict the speed of " fire and police vehicles and ambulances " and all other devices enumerated in subdivision 8.

On the whole I am of the opinion that the city should not be restricted to the definition in the law, and that the definition in the ordinance is controlling. If this be well founded, the defendant is amenable to the ordinance which does not except his automobile either as a police vehicle or otherwise.

However, if the contrary were to be held, there would remain the question whether the automobile of a game protector is a " police vehicle " when operated by him during his hours of duty. This is less a question of legal construction than a matter of general policy in law enforcement. Nor does it seem particularly helpful to ponder whether the defendant is to be regarded as in the nature of a peace officer either upon general principles or through a liberal construction of the Conservation Law. The test is whether he is such an officer as is contemplated by the statute when it excepts " police vehicles " from the operation of traffic restrictions. The importance of his duties is not to be minimized in a country whose natural resources suffer at prodigal hands. His duty is to preserve those things for the lawful and proper use and enjoyment of the public. Nevertheless he is not a police officer as that term is commonly regarded and used. Are his duties such that the use of an automobile in their performance renders it a " police vehicle " and thus immune to the safety restrictions imposed upon the general public?

The privileges and immunities granted to " fire and police vehicles " and to " ambulances " are to be extended with the greatest caution. Those who, especially in urban areas, are officially concerned with traffic restrictions witness an ever increasingn umber of public employees pleading immunity. But, generally speaking, there seems to be no good reason for regarding the public business as of more importance than private enterprise. Certainly it would be difficult to convince the taxpayer such is the case. Perhaps the public servant would do well to disclaim privileges in the use of highways that are not available to industry and commerce while producing the revenue from which his salary comes.

It may be that, as applied to an official act in an emergency or other matter of vital importance to the public, " the king can do no wrong." Even so, the public servant is not a prince of the royal blood. Official necessity is not to be mistaken for personal privilege, nor authority for impeccability.

Of course a sheriff may with impunity exceed speed restrictions when on the " hot trail " of one for whose arrest as a felon he has a warrant (*State* v. *Gorham*, 110 Wash. 330; 188 P. 457); and a police officer naturally must drive fast enough to catch a speeder (*Edberg* v. *Johnson*, 149 Minn. 395; 184 N. W. 12). Of at least equal importance is the speedy repair of a broken fire alarm wire (*People* v. *Mahoney*, 65 Misc. 449). In the latter case the superintendent of the alarm system violated a traffic restriction in hastening to the scene of the break. The court said that such a restriction could not be held to apply to the discharge of functions " virtually connected with public safety " or to a public officer on a " mission of vital importance."

The quoted words seem to apply the true test, public safety or other matter of vital importance to the public. To relax the rule of public safety of necessity is to open the door to personal privilege masquerading under the cloak of official action.

The defendant, it would seem, cannot qualify under the test of public safety or necessity. At any rate he has failed to do so by the evidence adduced. He testified that he was in the vicinity of the northeastern part of the city when he was informed by telephone that someone was trapping illegally south of the city. He proceeded up Culver road, the most direct route to the scene of the reported trapping. He left that route to go to his home to pick up, as he stated, a person to accompany him. That person was not a game protector nor did he have anything to do with conservation.

Shortly after he turned off Culver road the defendant was stopped by a police officer and charged with speeding. A discussion ensued and finally the defendant refused to accept a summons and sug-

gested that the matter be deferred. When he reached his home the prospective companion was not there. He finally located the man and proceeded on his mission.

From first to last the story negatives any thought of emergency or urgency. The defendant had departed from the direct route to pick up someone for reasons which, for all that appears, were purely personal and not official. He was on duty when he received the telephone call, but it does not appear that he was then accompanied by any one. He had time to argue with the police officer. He had time to locate the desired companion. Yet he would have the court believe that his mission was so urgent that he must violate the speed ordinance. If he were to be exonerated, the door could not consistently be closed to any public servant violating traffic restrictions during his working hours.

I find the defendant guilty as charged.